IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | CHAPTER 13 |
| MARK DAVID FRANKEL, | * | |
| Debtor | * | |
| | * | |
| MARK DAVID FRANKEL, | * | CASE NO. 1-05-bk-09306MDF |
| Plaintiff | * | |
| | * | |
| vs. | * | ADV. NO. 1-07-ap-00086 |
| | * | |
| BRIAN STRAYER, RICHARD WIX, and | * | |
| WIX, WENGER & WEIDNER, P.C., | * | |
| Defendants | * | |

## OPINION

Before me is an adversary proceeding in which Mark David Frankel ("Debtor") has requested the Court, pursuant to 11 U.S.C. § 362(h), to assess compensatory and punitive damages against: Brian Strayer; Richard Wix; and Wix, Wenger & Weidner, P.C. ("Defendants"). The unique set of facts that gave rise to this proceeding are as follows.

Debtor is a disbarred lawyer who was residing in the York County Prison as of the date of the hearing of this case. Brian Strayer ("Strayer") is a former client of Debtor's now-defunct law firm, Frankel & Associates (the "Frankel Firm"). Strayer, who had been severely injured in a construction-related accident in February 1999, hired the Frankel Firm to represent him in a lawsuit to recover compensation for the injuries he sustained. Strayer's suit settled for $530,000.00, which was paid into the Frankel Firm's client trust account, but Strayer never received his share of the recovery. After the Frankel Firm failed to respond to his demand for payment, Strayer went to state criminal authorities, who commenced an investigation into the Frankel Firm's financial affairs. As a result of this investigation, on September 19, 2005, Debtor

1

was indicted in York County, Pennsylvania on sixty counts[1] of Theft by Unlawful Disposition. Debtor filed the instant bankruptcy case on October 15, 2005, listing Strayer and other current and former clients of the Frankel Firm as creditors.

Debtor's criminal trial was scheduled for the July 2006 term in York County. On June 20, 2006, Debtor filed an Omnibus Pre-Trial Motion in which he sought, *inter alia*, a change of venue and a continuance of the trial date. In his request for a change of venue, Debtor alleged that due to his aggressive advertising, he was "the most famous lawyer in York County." As a consequence, when he was arrested, the local newspapers published "many articles" about his legal problems. Because of his high profile in the community and the extensive pre-trial publicity, Debtor alleged that he would be unable to obtain a fair trial unless it was heard outside of York County. The state court denied the request for a venue change, but did agree to continue the trial to the October 2006 term to enable his counsel to further prepare for trial.

On October 20, 2006, Richard Wix ("Wix") and the law firm of Wix, Wenger & Widener ("WW&W") filed a civil complaint ("the Complaint") on behalf of Strayer in the United States District Court for the Middle District of Pennsylvania naming Debtor and others as defendants. The Complaint was filed to recover Strayer's share of the personal injury settlement. Prior to filing the Complaint, Wix did not seek relief from the automatic stay from this Court.[2]

---

[1] The testimony at trial did not clearly establish whether Debtor was indicted on 60 or 61 counts. The precise number of criminal charges is not material to the issue in this case.

[2] Robert Knupp, who represented Strayer and other former Frankel Firm clients early in Debtor's bankruptcy case, obtained relief from the stay to enable Wix to depose one of Debtor's former employees. This order was limited in scope and did not authorize Wix to file the Complaint in federal district court.

On Sunday, October 29, 2006, the York Sunday News, a popular newspaper of general circulation in York County, published an article in which it described the filing of the Complaint and named Debtor as one of the defendants. The newspaper also reported that jury selection in Debtor's criminal trial was set to commence the following day – October 30, 2006.

During the preparation of Debtor's defense, his attorney, Joanne Floyd ("Floyd"), recommended that Debtor elect to try his case before a jury. On the morning of the criminal trial, reportedly because of fears that the York Sunday News article may have tainted the jury pool, Debtor's counsel and counsel for Debtor's co-defendant advised their clients to waive their right to a jury. Debtor accepted this recommendation and requested that his case be tried before the judge. After a bench trial on October 30, 2006, Debtor was convicted on 58 counts, including all charges involving the theft of Strayer's settlement funds. On the same day, Debtor's bankruptcy counsel notified Wix that the Complaint had been filed in violation of the automatic stay.

On June 13, 2007, Debtor filed the instant adversary case seeking sanctions for the filing of the Complaint in violation of the automatic stay. Trial was held on December 13, 2007 and January 17, 2008. Briefs have been filed and the matter is ready for decision.[3]

**Discussion**

Upon the filing of a bankruptcy petition, a stay arises by operation of law pursuant to 11 U.S.C. § 362(a). Under 11 U.S.C. § 362(a)(1), commencement of a judicial action, such as a federal lawsuit, is stayed by the filing of the petition. A violation of the stay can result in the

---

[3]I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A),(B) and (O). This Opinion constitutes findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052.

imposition of sanctions in the form of actual and/or punitive damages payable to the debtor. 11 U.S.C. § 362(h).[4]

An individual seeking damages under § 362(h) has the burden of establishing three elements by a preponderance of the evidence: (1) that the action taken was in violation of the automatic stay; (2) that the action was willful; and (3) that the violation caused actual damages. *See Clayton v. King (In re Clayton)*, 235 B.R. 801, 806-07 & n. 2 (Bankr. M.D.N.C. 1998). *See also In re Wingard,* 382 B.R. 892, 900 n. 6 (Bankr. W.D. Pa. 2008) (*citing Grogan v. Garner*, 498 U.S. 279, 286 (1991) (regarding the preponderance of the evidence standard of proof) ; *In re Pawlowicz*, 337 B.R. 640 (Bankr. N.D. Ohio 2005); *In re Westman*, 300 B.R. 338 (Bankr. D. Minn. 2003).

A violation of the stay is "willful" when a creditor with knowledge that a bankruptcy petition has been filed commits an intentional act that violates the stay. *Krystal Cadillac Oldsmobile GMC Truck, Inc. v. General Motors Corp. (In re Krystal Cadillac Oldsmobile GMC Truck, Inc.),* 337 F.3d 314 (3d Cir. 2003). Willfulness does not require that the creditor intend to violate the stay, but only that the creditor intend to take the action that is then determined to be in violation of the stay. *In re University Medical Center*, 973 F.2d 1065 (3d Cir. 1992); *In re Wingard*, 382 B.R. at 901.

---

[4] As the parties acknowledged at the trial, the provision for damages for a violation of the bankruptcy stay is currently codified at 11 U.S.C. § 362(k), but the changes to that section adopted in 2005 have no effect on the outcome in the instant case.

In the instant matter, Wix[5] admitted that he knew that Debtor had a pending bankruptcy case when he filed the Complaint and that any action against the Debtor could not be pursued absent relief from the automatic stay. Wix contends, however, that the filing of the Complaint was unintentional and occurred as the result of clerical error. He testified that more than one draft of the Complaint had been prepared and that Defendants intended to file the version that did not name Debtor as a defendant. Wix laid the blame for this mistake at the feet of one of his clerical staff who was responsible for the electronic filing of documents in district court. Wix further testified that after the article was published, he was contacted by Debtor's bankruptcy counsel who requested that the complaint be withdrawn or amended as to Debtor. On November 16, 2006, Wix filed an Amended Complaint deleting Debtor's name from the caption and removing the request for relief against Debtor. [6]

Debtor challenged Wix's explanation that multiple versions of the Complaint had been drafted and that the "wrong" version was filed the day before the criminal trial. Although there was a nine-day lull between the filing of the Complaint and the publication of the article in the York Sunday News, Debtor suggests that the Complaint was filed intentionally as a strategic ploy to create adverse publicity on the eve of Debtor's criminal trial. The Court does find it

---

[5]Both Wix and WW&W were represented by the same attorney in the instant case and Wix testified on behalf of both WW&W and himself. WW&W presented no witnesses of its own. Therefore, the findings that I make herein based on Wix's testimony are findings that pertain to WW&W as well as Wix himself.

[6]Wix does not argue that he did not violate the stay because he only acted in a representative capacity to advance Strayer's interests. Numerous courts have found attorneys to be personally liable for damages under § 362(h) even when their actions were undertaken only within the scope as counsel for a creditor. *See In re Timbs*, 178 B.R. 989, 999 (Bankr. E.D. Tenn. 1994) (collecting cases).

5

perplexing that Wix would prepare a pleading naming Debtor if he did not intend to make Debtor a defendant. But rather than finding the act to be intentional, the Court believes that Wix's actions were simply negligent. However, whether the Complaint was filed in error or with mal intent is of no moment. Under *University Medical Center*, Wix and WW&W intentionally filed the Complaint fully aware of the pending bankruptcy. Therefore, Debtor has satisfied his burden of proving the first two elements of a case for damages under § 362(h). The remaining issue for determination is the amount of damages that flowed from this violation.

    *a. Actual damages*

"For § 362(h) purposes, actual damages should be awarded only if there is concrete evidence supporting the award of a definite amount" that can be ascertained with "reasonable certainty." *Doe v. United States*, 976 F.2d 1071, 1085 (7th Cir. 1992), *cert. denied*, 510 U.S. 812 (1993); *In re Heghmann*, 316 B.R. 395, 405 (B.A.P. 1st Cir. 2004) (citing *In re Sumpter*, 171 B.R. 835, 844 (Bankr. N.D. Ill. 1994)). A damages award under § 362(h) cannot be based on mere speculation, guess, or conjecture. *Heghmann*, 316 B.R. at 405 (citing *Adams Apple Distrib. Co. v. Papeleras Reunidas, S. A.*, 773 F.2d 925, 930 (7th Cir. 1985)).

Section 362(h) specifically provides that actual damages for violation of the automatic stay includes attorneys fees. "[E]ven innocent and well-grounded violations of the automatic stay should give rise to recovery of attorneys' fees when a debtor is required to resort to a court action to vindicate rights." *In re McNeil*, 128 B.R. 603, 614 (Bankr. E.D. Pa. 1991)(internal citation omitted.) Some courts have required the payment of attorneys' fees and costs for a creditor's willful violation of the automatic stay even if the debtor suffered no other compensable harm. *In re Heidkamp*, 334 B.R. 713 (Bankr. M.D. Fla. 2005).

6

Debtor's counsel has supplied the Court with a detailed statement of the actions he undertook to notify Wix of the violation of the stay and to ensure that the Complaint was withdrawn. Defendants have not contested the accuracy of this statement. Thus, damages to be awarded in this case will include the fees that Debtor incurred in bringing the violation to Wix's attention, as well as fees incurred to ensure that action on the Complaint did not proceed. Damages should also include, to a limited extent, the fees that Debtor incurred to litigate the instant adversary.

In addition to his attorney fees, Debtor also seeks to recover $30,000 for the loss of Debtor's right to a trial by jury. At trial on the instant matter, Debtor stated that "I do not challenge for one second that I was found guilty, that there was an amount – a shortfall in the escrow fund. There's no question about that." (N.T. 90, December 17, 2007). Debtor concluded, however, that because some clients eventually received the proceeds from the lawsuits to which they were entitled, they could not be considered victims, and the counts related to them would have to be thrown out. "And I felt that on that basis a jury would have difficulty trying to figure it out on its own and as a part of the trial strategy that that was the way to go." (N.T. 90, December 13, 2007).

A fair reading of this statement in the context of the instant case is that Debtor seeks damages from Defendants because the Complaint filed in violation of the stay caused the York Sunday News to publish an article producing negative pre-trial publicity that then led Debtor to re-think his criminal trial strategy and pursue a bench trial, rather than a jury trial, which resulted in a conviction. This theory of damages, which appears to have been fashioned by Rube Goldberg, has several weaknesses.

7

First, Debtor failed to establish that Defendants influenced the publication of the article describing the filing of the Complaint, or the timing of its publication one day before the criminal trial. Debtor admits that numerous articles about the various accusations against him had been prominently featured in various publications because of his notoriety in the community, although he did argue that coverage of his legal difficulties had subsided in the weeks immediately before the trial. It is equally as plausible to believe that the York paper was looking for a new angle for a story it planned to run immediately before the trial as it is to assume that the article was published as a consequence of the filing of the Complaint. This interpretation is bolstered by the timing of the article, which did not appear until October 29, nine days after the Complaint was filed, but immediately before the criminal trial.[7] If Defendants had not filed the Complaint, but rather had been interviewed by the press about the claims against Debtor, there would have been no bar to the newspaper publishing an article about the upcoming civil case timed to coincide with the criminal trial. Regardless of the filing of the bankruptcy petition, Defendants would have been free to discuss a potential lawsuit with the press. The automatic stay does not function as a gag order on adverse publicity.

If one considers what logically could have occurred if Wix had filed the "correct" complaint, which did not name Debtor as a defendant, the weaknesses of Debtor's argument are apparent. For Debtor to prevail on his claim, I must conclude that the York Sunday News would not have printed an article about the lawsuit unless Debtor was named as a defendant. This I cannot do. The article appeared with the headline: "Client sues ex-Frankel associates, filing

---

[7]There was no evidence presented as to whether the Complaint had been served on Debtor, or whether he had other notice of its filing, prior to the publication of the article in the York Sunday News.

8

claims lawyers, bank were aware of improper use of client's funds." (Plaintiff's Exhibit 5). This headline would have been appropriate even if Debtor had not been named as a defendant. In fact, the article did not focus on Debtor, but rather on whether other parties were "aware of a 'Ponzi scheme' to use trust fund money . . . for another purpose." (Plaintiff's Exhibit 5). Debtor was unable to establish that "but for" the filing of the Complaint naming him as a defendant, the York Sunday News would not have published an article about the lawsuit generating unfavorable pretrial publicity.

Second, even if Debtor were able to establish that the filing of the Complaint was responsible for the publication of the article that generated negative publicity before the trial, Debtor waived his right to a jury trial before he determined whether an unbaised jury could be selected.

A trial court is granted wide discretion to conduct *voir dire* on the effect of pretrial publicity to root out juror bias. *Mu'min v. Virginia*, 500 U.S.415, 427, 111 S.Ct. 1899, 1907 (1991). In Debtor's criminal case, the venire had been assembled, and the trial judge[8] had informed Debtor that he intended to allow vigorous questioning of individual potential jurors on the specific issue of their knowledge of the York Sunday News article. But without questioning the potential jurors as to whether they read the article and, if so, whether it changed their opinions as to his guilt or innocence, Debtor opted for a bench trial. Floyd testified that she recommended this course of action because she believed that the jury would not respond truthfully to questions about whether they had an opinion as to Debtor's guilt or innocence based on what they had read or heard about the case. (N.T. 27, January 17, 2008). Debtor determined

---

[8]The criminal proceeding was tried by a visiting judge from outside York County.

9

Case 1:07-ap-00086-MDF    Doc 42    Filed 07/14/08    Entered 07/14/08 14:09:55    Desc
Main Document      Page 9 of 14

that he could not get a fair trial before a jury because of pretrial publicity without first testing that theory.

Debtor's concern about whether an unbiased jury could be selected predates the publication of the York Sunday News article. During pretrial proceedings, Debtor had sought a change of venue, which was denied by the trial judge. A state court judge is required to grant a change of venue request "'if a fair and impartial jury cannot be selected in the county in which the crime occurred,' a determination that the trial court is best suited to make." *Commonwealth v. Karenbauer*, 552 Pa. 420, 433-34, 715 A.2d 1086, 1092 (1998) *cert. denied*, 526 U.S. 1021, *quoted in Commonwealth v. Wimbush*, ___ A.2d ___, 2008 WL 2287517 *3 (Pa. Super.). A change of venue is not warranted simply because there is pre-trial publicity. The defendant must show that the publicity was so "extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Commonwealth v. Thomas*, 879 A.2d 246, 259-60 (Pa. Super. 2005) (cited in *Winbush*, 2008 WL 2287517 *3). Despite significant adverse publicity after the criminal charges were filed, the trial court apparently believed that an untainted jury could be selected.

On the eve of trial, Debtor decided not to file a second request for a change of venue due to pretrial publicity because he believed that the trial judge would not grant the request. Rather than *voir dire* the venire he opted to pursue a bench trial. Neither of these decisions were forced upon Debtor. They were choices he made. Accordingly, Debtor's assertion that Defendants' actions deprived him of a right to a jury trial pursuant to the Sixth Amendment to the United States Constitution is not supported by the evidence. If Debtor had chosen to *voir dire* the venire

10

Case 1:07-ap-00086-MDF    Doc 42    Filed 07/14/08    Entered 07/14/08 14:09:55    Desc
Main Document      Page 10 of 14

and pervasive bias was identified, then Debtor's argument that pretrial publicity had tainted the jury would have had greater merit. Having failed to test the venire, however, Debtor cannot now assert that an unbiased jury could not have been selected.

Finally, Debtor fixes the value of a right to a jury trial at $30,000.00. The method by which he arrived at this value is not of record. Therefore, even if I were to conclude that Debtor lost his right to trial by jury through the filing of the Complaint in violation of the automatic stay, the sum he requests would be purely and improperly speculative.

Although Wix and WW&W clearly engaged in a willful violation of the automatic stay, Debtor's assertion that Defendant's actions deprived him of his right to a trial by jury is spurious. Therefore, while actual damages awarded may include attorneys' fees, it would be inappropriate to include the fees billed by Debtor's counsel for pursuing the theory that Debtor's Sixth Amendment rights were violated. Young's fees related to the violation of the automatic stay totaled $17,734.00 for 85.60 hours of work by various members of his firm. I have closely reviewed his billing record and have determined that the fees generated to ensure that the Complaint filed in violation of the stay was withdrawn are $4,832.00. Accordingly, damages in this case will be limited to that amount.

   *b. Punitive damages*

"[P]unitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes. Such awards are reserved for cases in which the defendant's conduct amounts to something more than a bare violation justifying compensatory damages or injunctive relief. To recover punitive damages, the defendant must have acted with actual knowledge that he was violating the federally protected right or with reckless disregard of

11

Case 1:07-ap-00086-MDF    Doc 42    Filed 07/14/08    Entered 07/14/08 14:09:55    Desc
Main Document    Page 11 of 14

whether he was doing so." *In re Wagner*, 74 B.R. 898, 903-04 (Bankr. E.D. Pa. 1987) (quoting *Cochetti v. Desmond,* 572 F.2d 102 (3d Cir.1978) (internal quotations omitted); *In re Patterson*, 263 B.R. 82, 97 (Bankr. E.D. Pa. 2001). Punitive damages are especially appropriate when a party has acted in "arrogant defiance" of the Bankruptcy Code. *In re Medlin*, 201 B.R. 188 (Bankr. E.D. Tenn. 1996) (cited in *In re Curtis*, 322 B.R. 470, 487 (Bankr. D. Mass. 2005)). Whether actions taken by a party in connection with a violation of the automatic stay merit an assessment of punitive damages is a matter left within the sound discretion of the bankruptcy court. *Clayton,* 235 B.R. at 811; *In re Hendry,* 214 B.R. 473 (Bankr. E.D. Va. 1997).

Four factors are considered when determining whether to award punitive damages and, if so, in what amount: (1) the defendants' conduct; (2) their motives; (3) any provocation by the debtor; and (4) each individual defendant's ability to pay. *In re B. Cohen & Sons Caterers, Inc.,* 108 B.R. 482, 487 (E.D. Pa. 1989); *In re Patterson*, 263 B.R. at 97; *see also In re Aponte*, 82 B.R. 738, 745 (Bankr. E.D. Pa. 1988) (court must consider both the wrongdoer's act and his motive); *In re Wagner,* 74 B.R. 898, 905 (Bankr. E.D. Pa.1987)(court must consider the nature of the conduct and the ability to pay). It seems premature, however, to consider whether a defendant has the ability to pay punitive damages in any amount until it is determined whether punitive damages are justified.

A court considering the imposition of punitive damages must be mindful of their purpose. "Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future." *Restatement (Second) of Torts* § 908 (1979). A creditor in violation of the automatic stay has a duty to rectify the situation, whether that behavior is

12

intentional or inadvertent. *Indiana Dept. of Revenue v. Williams*, 301 B.R. 871 (S.D. Ind. 2003). "[E]ven if a creditor is initially unaware of the automatic stay, the creditor has an affirmative duty to stop or correct actions that continue to violate the stay once the creditor is made aware of the stay." *In re Glanzer* 2008 WL 938590, 2 (Bankr.N.D.Ohio) (citing *In re Roberts*, 175 B.R. 339, 343 (B.A.P. 9th Cir. 1994)("a garnishing creditor has an affirmative duty to stop garnishment proceedings when notified of the automatic stay.") (other internal citations omitted). The failure to promptly remedy a violation of the stay, even a technical one, may provide grounds for the assessment of punitive damages under § 362(h). *In re Will*, 303 B.R. 357, 368 (Bankr. N.D. Ill. 2003); *In re Rosa*, 313 B.R. 1, 8 (Bankr. D. Mass. 2004). Here, Defendants, fully aware of the automatic stay, filed the Complaint naming Debtor as a defendant. When notified of the violation, Defendants waited seventeen days to undo the violation by filing an amended complaint. However, no action was taken to pursue the Complaint and Debtor was not required to defend the action.

I find credible Wix's testimony that he did not intend to sue Debtor personally and that the purpose of the litigation was to pursue Strayer's claims against the other defendants. Other than the existence of the Complaint itself, Debtor suffered no other damages as a consequence of Defendants' violation of the stay. Taking into account the nature of the Defendants' conduct and the extent of harm caused to the Debtor, this Court finds that an award of punitive damages would not be appropriate.[9] As such, it is unnecessary to determine whether Defendants actions were provoked by Debtor or whether Defendants have the means to pay punitive damages. I find

---

[9]In making this ruling, I do not condone the actions of Wix or WW&W. If more significant damages had arisen as a result of the violation, I would not have hesitated to impose more significant sanctions.

13

that an award of attorneys' fees and costs and publication of this opinion is a sufficient sanction to deter Wix and WW&W from future violations of the automatic stay and to punish their conduct. Defendant Strayer had no role in the filing of the Complaint and clearly did not engage in any conduct that would justify the imposition of punitive damages. Consequently, punitive damages are not an appropriate remedy in this case, and the request for this relief will be denied.

An appropriate order will be entered.

By the Court,

*Mary D. France*
Bankruptcy Judge

Date: July 14, 2008

*This document is electronically signed and filed on the same date.*

14

Case 1:07-ap-00086-MDF    Doc 42    Filed 07/14/08    Entered 07/14/08 14:09:55    Desc
              Main Document           Page 14 of 14